**IN THE UNITED STATES DISTRICT COURT**
**<u>FOR THE DISTRICT OF COLORADO</u>**

| | |
|---|---|
| YOHANNA WALLACE, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) **CIVIL ACTION NO.:** |
| v. | ) ) |
| PILGRIM'S PRIDE CORPORATION, JBS USA HOLDINGS, INC., THE BOARD OF DIRECTORS OF PILGRIM'S PRIDE CORPORATION, JBS INVESTMENT COMMITTEE, and JOHN DOES 1-20, | ) **CLASS ACTION COMPLAINT** ) ) ) ) ) |
| Defendants. | ) |

Plaintiff, Yohanna Wallace ("Plaintiff"), by and through her attorneys, on behalf of the

Pilgrim's Pride Retirement Savings Plan (the "Plan"),[1] herself and all others similarly situated,

states and alleges as follows:

## I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, Pilgrim's Pride Corporation ("Pilgrim's Pride" or the "Company"), JBS USA

Holdings, Inc. ("JBS"), the Board of Directors of Pilgrim's Pride Corporation (the "Board") and

the JBS Investment Committee of Pilgrim's Pride Retirement Savings Plan ("Committee"), during

the Class Period, for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the Plan, at 6 ("Pilgrim's Pride Retirement Savings Plan (the Plan) is a defined contribution plan adopted by Pilgrim's Pride Corporation (the Plan Sponsor … ").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4.      The Tenth Circuit has recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.).

5.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look*

2

*at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

6.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

7.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

8.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

9.      Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

10.     At all times during the Class Period, the Plan had about four hundred million dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $399,126,544 in

assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

11.    By 2024, the Plan had $478,220,951 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

12.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 19,250 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 21,423 participants. *See* 2024 Form 5500 for the Plan, at 2.

13.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.    Specifically, Defendants allowed substantial assets in the Plan to be invested in a Great-West Life & Annuity Insurance Company[2] ("Great-West" or "GWL&A") Guaranteed Investment Contract ("GWL&A GIC"). The GWL&A GIC carried more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

15.    Great-West benefited significantly from Plan participants being invested in the GWL&A GIC. The assets invested in the GWL&A GIC were held and invested by Great-West,

---

[2] "On August 1, 2022, Empower announced certain operating companies within Empower's corporate group would be renamed to include "Empower" in their legal names. Great-West Life & Annuity Insurance Company (GWL&A) is now Empower Annuity Insurance Company of America (Empower Annuity) and Great-West Trust Company, LLC (Great-West) is now Empower Trust Company, LLC (Empower). Empower Annuity is the Plan's custodian and Empower is the Plan's trustee." Independent Auditor's Report ("Auditor's Report"), attached to 2022 Form 5500 for the Plan, at 6. All references to "Great-West" and its affiliates throughout this complaint include the subsequently named Empower and its affiliates, where and when appropriate.

which kept the spread (the difference between the amount Great-West earned on the investments and the amount Great-West paid to Plan participants). The crediting rates that Great-West provided to investors in the GWL&A GIC were/are so low that Great-West reaped a windfall on the spread.

16.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Great-West,[3] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the GWL&A GIC.

17.     The arrangements and transactions with Great-West are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

18.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

---

[3] "GWL&A and Great-West are the custodian and trustee, respectively, of the Plan; therefore, transactions with the custodian and trustee, as well as with the affiliated retirement services provider, Empower Retirement Advisory Service, qualify as party-in-interest transactions." Auditor's Report, attached to 2021 Form 5500 for the Plan, at 12.

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

21.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

22.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

### **Plaintiff**

23.      Plaintiff, Yohanna Wallace ("Wallace"), resides in Greeley, Colorado. During her employment, Plaintiff Wallace participated in the Plan. Ms. Wallace invested in the GWL&A GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the GWL&A GIC.

24.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as

6

of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

25.     Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

26.     Pilgrim's Pride Corporation is the Plan Sponsor and a named fiduciary of the Plan with a principal place of business at 1920 Atherholt Road, Lynchburg, Virginia. *See* the 2024 Form 5500 at 1. "Pilgrim's [Pride] is a leading global provider of high-quality food products, including well-recognized brands and value-added premium products."[4]

27.     "The Plan Administrator is responsible for the day-to-day administration and operation of the Plan." Pilgrim's Pride Retirement Savings Plan Summary Plan Description ("SPD"), at 20; *see also id*. ("The Plan Administrator has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies). Any such determination by the Plan Administrator is conclusive and binding upon all persons.").

---

[4]  https://www.pilgrims.com/about-us/ last accessed on December 29, 2025.

28.     Further, the JBS Investment Committee "is appointed by Board of Directors of [JBS USA Holdings, Inc. and Pilgrim's Pride Corporation." Investment Policy Statement, Effective January 1, 2014, Amended January 1, 2025 ("IPS"), at 2.

29.     Pilgrim's Pride appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, Pilgrim's Pride during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

31.     For the foregoing reasons, Pilgrim's Pride is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**JBS**

32.     "JBS USA is a leading global provider of diversified, high-quality food products, including a portfolio of well-recognized brands and innovative, value-added premium products."[5]

33.     As indicated above and through its board of directors, JBS, along with Pilgrim's Pride, appointed the JBS Investment Committee. *See* IPS, at 2.

34.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[5] https://sustainability.jbsfoodsgroup.com/chapters/who-we-are/about-our-company/ last accessed on December 29, 2025.

35.    Accordingly, JBS during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

36.    For the foregoing reasons, JBS is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

37.    Pilgrim's Pride, acting through its Board, appointed the Committee. Accordingly, like the Company, the Board had a concomitant fiduciary duty to monitor and supervise the Committee.

38.    Each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

39.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

40.    As discussed above, Pilgrim's Pride and JBS appointed the JBS Investment Committee to, among other things, ensure that the investments available to Plan participants are appropriate and performed well as compared to their peers.

41.    Specifically, "[t]he duties and responsibilities of the Committee include [among other things]: … identifying and selecting a blend of well-managed and diversified investment options for the Plans; monitoring regularly the investment strategies, performance, and risk characteristics of investment options; … taking appropriate action if objectives are not being met

9

and the Committee does not believe appropriate corrective action is being taken by a fund or investment manager, or if the investment strategy employed by any fund or investment manager is no longer appropriate for the investment option." IPS, at 2; *see also* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6 ("The Plan is administered by the JBS Investment Committee (the Committee) which is composed of employees of the Company. The Committee is responsible for the operation and administration of the Plan and the management of the Plan's assets.").

42.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

43.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV.     CLASS ACTION ALLEGATIONS[6]

44.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Pilgrim's Pride Retirement Savings Plan, at any time between January __, 2020 through the through the date of judgment (the "Class Period").

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiff reserves the right to propose other or additional classes or subclasses in the motion for class certification or subsequent pleadings in this action.

45. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 21,423 Plan "participants with account balances as of the end of the plan year." *See* 2024 Form 5500, at 2.

46. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

47. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

48. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous

11

prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

49.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

50.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

51.     The Company established the Plan in January 1969, for the benefit of its employees. *See* Auditor's Report attached to 2024 Form 5500 for the Plan, at 6.

52.     The purpose of the Plan was to provide employees "with the opportunity to save for retirement on a tax-advantaged basis." SPD, at 3.

53.     The Plan, "was most recently restated effective August 1, 2021." Auditor's Report attached to 2024 Form 5500 for the Plan, at 6.

54.     "The Plan was amended effective January 1, 2024." *Id*.

55.     The Plan is a "defined contribution"[8] or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

56.     Throughout the Class Period, the GWL&A GIC was an investment fund available in the Plan.

57.     At the end of 2020, $75,130,107 in Plan assets were invested in the GWL&A GIC. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 14.

58.     At the end of 2024, over $77 million in Plan assets were invested in the GWL&A GIC. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 13.

59.     The chart below demonstrates the amount of Plan assets invested in the GWL&A GIC during the Class Period.

| Plan Year | Plan Assets in GWL&A GIC |
|---|---|
| 2020 | $75,130,107 |
| 2021 | $73,716,978 |
| 2022 | $76,037,124 |
| 2023 | $73,300,338 |
| 2024 | $77,084,089 |

---

[8] Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6.

*Eligibility*

60.     In general, the Plan allows employees of Pilgrim's Pride to participate in the Plan after they are hired. *See* SPD, at 2. ("Employees "will be eligible to participate for purposes of elective deferrals when [they] have attained age 18."").

61.     To receive matching company contributions, and nonelective contributions, employees "will be eligible to participate for purposes of matching [and nonelective] contributions when [they] have completed one (1) Year of Service and have attained age 18." *Id*.

62.     Like other companies that sponsor 401(k) plans for their employees, Pilgrim's Pride enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

63.     Pilgrim's Pride also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

64.     Given the size of the Plan, Pilgrim's Pride likely enjoyed significant tax and cost savings from offering a match.

## VI.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

65.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

66.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

67.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

68.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

69.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

70.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

71.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

72.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

73.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

74.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

75.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

76.     Per the Plan's IPS, the Committee is required to select investment options for Plan participants. The performance of the investment option "should be greater than or within a

reasonable range of the median return for an appropriate, style-specific benchmark and/or peer group over a reasonable period of time." IPS, at 3.

77.    Further, the Committee is to "monitor the investments … at least annually and will add, remove or change investment managers or funds as may be appropriate by using the same framework that was the basis of the selection decision." *Id*., at 4.

78.    Defendants "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

79.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

80.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff first wrote to the Plan administrator on August 19, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

17

81.    By correspondence dated September 15, 2025, the Plan administrator denied the Plaintiff's request for meeting minutes.

82.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

83.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

84.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the GWL&A GIC in the Plan that wasted the assets of the Plan and the assets of participants because of underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the GWL&A GIC**

85.    A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[10]

---

[10] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

86.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[11]

87.     There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the GWL&A GIC; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

88.     "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[12]

89.     As indicated above, the Plan was invested in the GWL&A GIC, a proprietary stable value fund managed by Great-West, then later by Empower.

90.     There are two significant problems with the GWL&A GIC discussed below. First, the GWL&A GIC is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the GWL&A GIC thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

91.     The second related problem with the GWL&A GIC is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

---

[11] *Id*.

[12] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

92.     Defendants' selection of the imprudent GWL&A GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.    The Plan's Inclusion of the GWL&A GIC

93.     At all relevant times, Defendants exercised control over the Plan's investments, including the Plan's GWL&A GIC.

94.     "EAICA is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan." Auditor's Report, attached to 2024 Form 5500 for the Plan, at 11.

95.     A prudent fiduciary should be aware of the rates and prevailing marketplace on at least a semi-annual basis.

96.     The Form 5500 Auditor's Notes state as follows:

> The Plan holds a fully benefit-responsive guaranteed investment contract, Guaranteed Interest Fund, with Empower Annuity Insurance Company of America (EAICA). EAICA maintains the contributions in a general account. The account is credited with earnings or losses on the underlying investments and charged for participant withdrawals and administrative expenses. EAICA is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan. ***The methodology for calculating the interest crediting rate is based on the earnings of the underlying assets in the entire medium-long term new portfolio compared to the minimum interest crediting rate, as stated in the contract, and prevailing market conditions. The crediting rate is reviewed on a quarterly basis for resetting.*** The average yield earned by the Plan was 1.66% for 2024 and 1.48% for 2023.
>
> ***The contract meets the fully benefit-responsive traditional investment contract criteria and, therefore, is reported at contract value***. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by EAICA, represents contributions made under the contract, plus earnings less participant withdrawals and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of

all or a portion of their investment at contract value. The Plan's ability to receive amounts due is dependent on EAICA's ability to meets its financial obligations. EAICA's ability to meet its contractual obligations may be affected by future economic and regulatory developments.

Certain events may limit the ability of the Plan to transact at contract value with EAICA. Such events include, but may not be limited to, spin-off, sale, merger, full or partial termination including distribution of assets performed by a qualified termination administrator, terminating union or participating employer in a multiple employer plan, or a layoff of at least 20% of work force in any twelve month period.

***The Company believes that no events are probable of occurring that might limit the ability of the Plan to transact at contract value with EAICA and that also would limit the ability of the Plan to transact at contract value with the participants.*** In addition, certain events allow EAICA to terminate the contract with the Plan and settle at an amount different from contract value. Examples of circumstances which would allow EAICA to terminate the contract include the Plan's loss of its qualified status, uncured material breaches of responsibilities, or material and adverse changes to the provisions of the Plan. ***The Company believes that any events allowing EAICA to terminate the contract and settle at an amount different from contract value are not probable of occurring***.

97.    For these reasons, the GWL&A GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The GWL&A GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the GWL&A GIC, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

98. Defendants' selection of the imprudent GWL&A GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 2. There are Many GICs in the Marketplace with Competitive Crediting Rates

99. The Plan's fiduciaries should not have selected or maintained the GWL&A GIC.

100. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

101. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

102. These comparisons include:

- Auto-Owners Insurance Company Retirement Savings Plan offered a "fully benefit-responsive investment contract." Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the GWL&A GIC, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Shands Jacksonville Retirement Plan offers a traditional guaranteed investment contract with Variable Annuity Life Insurance Company ("VALIC"). Auditor's Report, attached to the 2023 Form 5500 for the Shands Jacksonville Retirement Plan, at 12. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan." *Id.* Like the GWL&A GIC, "[t]he crediting rate is reviewed on a quarterly basis for resetting." *Id.* Further, the company states that "no events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id.*

103. The GWL&A GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared

against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[13] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
|  | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
|  | **Pilgrim's Pride Plan** | **19,250** | **$399,126,544** | **GWL&A GIC** | **1.76%** |
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
|  | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
|  | **Pilgrim's Pride Plan** | **19,689** | **$440,700,650** | **GWL&A GIC** | **1.65%** |
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
|  | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
|  | **Pilgrim's Pride Plan** | **20,415** | **$382,161,600** | **GWL&A GIC** | **1.48%** |

---

[13] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| | **Pilgrim's Pride Plan** | **20,852** | **$431,359,795** | **GWL&A GIC** | **1.18%** |
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Shands Jacksonville Retirement Plan | 7,498 | $443,251,343 | VALIC | 4.38% |
| | **Pilgrim's Pride Plan** | **21,423** | **$478,220,951** | **GWL&A GIC** | **2.07%** |

104.     Throughout the Class Period, the GWL&A GIC in the Plan underperformed the comparator funds by an average of almost 57%, as demonstrated in the table below.

| Year | GWL&A GIC Rate of Return in the Plan | Comparator Average Rate of Return | GWL&A GIC Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.76% | 3.91% | 52.43% |
| 2021 | 1.65% | 3.93% | 55.76% |
| 2022 | 1.48% | 3.80% | 59.89% |
| 2023 | 1.18% | 3.99% | 69.74% |
| 2024 | 2.07% | 3.89% | 46.79% |
| Average Underperformance during Class Period | | | 56.92% |

24

105.    The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the GWL&A GIC's dismal crediting rate.

106.    Again, specific Comparator GICs used herein all had similar risk considerations based on their terms and the creditworthiness of their insurance carriers. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the GWL&A GIC.

107.    In short, because the Plan held between $300 million and $500 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

108.    Additionally, the Plan's GWL&A GIC underperformed other traditional guaranteed investment contracts, with similar characteristics as the GWL&A GIC, during the Class Period, as demonstrated in the table below:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[14] |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |

---

[14] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | **Pilgrim's Pride Plan** | **19,250** | **$399,126,544** | **GWL&A GIC** | **1.76%** |
| | | | | | |
| 2021 | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | **Pilgrim's Pride Plan** | **19,689** | **$440,700,650** | **GWL&A GIC** | **1.65%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |

| | | | | | |
|---|---|---|---|---|---|
| | Retirement Plan | | | | |
| | **Pilgrim's Pride Plan** | **20,415** | **$382,161,600** | **GWL&A GIC** | **1.48%** |
| | | | | | |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | **Pilgrim's Pride Plan** | **20,852** | **$431,359,795** | **GWL&A GIC** | **1.18%** |
| | | | | | |
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **Pilgrim's Pride Plan** | **21,423** | **$478,220,951** | **GWL&A GIC** | **2.07%** |

27

109.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to Insurance Companies and other providers of stable value investments.

110.    By selecting the GWL&A GIC with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

111.    With the significant amount of assets under management in the GWL&A GIC, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.

112.    The GWL&A GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

113.    Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

...

 (C) furnishing of goods, services, or facilities between the plan and a party in interest;

 (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

114. Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

 (1) deal with the assets of the plan in his own interest or for his own account,

 (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

115. During the Class Period, Defendants allowed Plan assets to be invested in the GWL&A GIC that performed poorly when compared to other investments that were available, and knowing that Great-West, or its affiliates, were/are offering recordkeeping and trustee services to the Plan.

116. "GWL&A and Great-West are the custodian and trustee, respectively, of the Plan; therefore, transactions with the custodian and trustee, as well as with the affiliated retirement services provider, Empower Retirement Advisory Service, qualify as party-in-interest transactions." Auditor's Report, attached to 2020 Form 5500, at 10.

117. As an alternative to investing Plan assets in the GWL&A GIC, the Plan could have invested assets in better performing investments with the same investment strategies and goals.

Defendants failed to consider this approach because it would have eliminated the compensation earned by Great-West.

118.    Defendants did not prudently and objectively evaluate the GWL&A GIC in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the GWL&A GIC in order to benefit Great-West and its affiliates.

119.    The Plan's sizeable investment in the GWL&A GIC provided Great-West a substantial amount of compensation at the expense of Plan participants.

**COUNT I**
**Breach of Fiduciary Duty of Prudence**
**(against the Committee)**

120.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

121.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

122.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

123.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the

Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

124.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the GWL&A GIC, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

126.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Pilgrim's Pride, JBS, and the Board)**

127.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

128.    Pilgrim's Pride, JBS, and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

31

129.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

130.    The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

131.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

132.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

133.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## COUNT III
## PROHIBITED TRANSACTION
### (against all Defendants)

134. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

135. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

136. Defendants were at all times fiduciaries to the Plan.

137. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

138. Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Great-West.

139. Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Great-West and the Plan.

140. When Defendants caused the Plan to engage in the annuity transaction, Great-West was a party in interest, including because Great-West, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

141.    These transactions occurred each time the Plan paid fees to Great-West in connection with the Plan's investments in the GWL&A GIC and other proprietary options that paid revenue sharing to Great-West.

142.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

<strong><u>PRAYER FOR RELIEF</u></strong>

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

34

E.       An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.       Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.       An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.       Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

K.       An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.       Such other and further relief as the Court deems equitable and just.

Dated: January 30, 2026                                **CAPOZZI ADLER, P.C.**

                                                       */s/ Mark K. Gyandoh*
                                                       Mark K. Gyandoh, Esquire

James A. Maro, Esquire
312 Old Lancaster Road
Merion Station, PA 19066
Phone: (610) 890-0200
Email: markg@capozziadler.com
        jamesm@capozziadler.com

*Counsel for Plaintiff and the Putative Class*